## ALLSTATE INSURANCE COMPANY
v.
## The OXFORD FINANCE COMPANIES, Inc.
Civ. No. 14844.

United States District Court
D. Maryland.

Sept. 27, 1967.

Robert R. Bair, Joseph H. H. Kaplan and Venable, Baetjer & Howard, Baltimore, Md., and Sonnenschein, Levinson, Carlin, Nath & Rosenthal, Chicago, Ill., for plaintiff.

T. Hughlett Henry, Jr., Easton, Md., Jesse Slingluff and John C. Cooper, III, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

Plaintiff, Allstate Insurance Company ("Allstate"), an Illinois corporation, seeks to recover from defendant, The Oxford Finance Companies, Inc. ("Oxford"), a Pennsylvania corporation, an amount equal to accrued and unpaid dividends on certain shares of prior preferred stock of Maryland Credit Finance Corporation ("Maryland"), a Delaware corporation. Allstate formerly owned those shares. Allstate also claims from Oxford certain premium payments in connection with the redemption of those shares. Further, Allstate sues for interest on each of the amounts so claimed. Maryland merged with and into Oxford on January 1, 1963. Oxford is named defendant herein as Maryland's successor. The parties agree that the amount in controversy, exclusive of interest, exceeds $10,000.

Prior to trial, before this Court sitting without a jury, the parties, by their respective counsel, stipulated many of the relevant facts. That stipulation is embodied in the Pre-Trial Order of this Court. At the trial voluminous exhibits were introduced, testimony was taken, and argument of counsel was heard. Both before and after trial counsel for both parties submitted detailed written factual and legal analyses and presentations. After consideration of all of the above this Court has determined that Allstate is entitled to judgment against Oxford in an amount equivalent to the accrued and unpaid dividends on August 1,

1962, on the shares of Maryland's prior preferred stock which Allstate surrendered on that date and on April 10, 1962. Allstate is also entitled to receive the payment of interest on that amount at the rate of six percent (6%) per annum from January 1, 1963, to and including the date of payment of the judgment herein.

Allstate rests certain claims upon its contention that pursuant to contractual undertakings and understandings involving it and Maryland, Allstate, in 1961 or 1962, became a creditor rather than a prior preferred stockholder of Maryland. Allstate also bases its claim to premium payment upon its conclusion that Maryland engaged in "a liquidation, dissolution or winding up"of Maryland's affairs, as those words are used in Article FOURTH (2) of Maryland's charter, as amended. For reasons stated in this oinion, this Court does not find it necessary to state answers to the questions presented by those arguments and contentions of Allstate.

The Court makes the following findings of fact:

1. Maryland was incorporated in Delaware in 1921, and from that date until its merger with Oxford on January 1, 1963, was engaged in the business of credit financing and related matters.

2. In 1955 and 1956, there were issued and outstanding certain shares of 6% preferred stock and of common stock of Maryland. At that time, Maryland's officers and directors decided that Maryland required additional funds. For that reason Maryland created a new class of $100 par, 6% cumulative prior preferred stock and issued and sold in 1956, 5,000 shares of such stock to Allstate.

3. *Inter alia,* the terms of the prior preferred stock provided for preferential, cumulative dividends; for redemption at the discretion of Maryland, in whole or in part, at $105 per share prior to December 31, 1960 (and $103.50 per share thereafter) plus unpaid and accumulated dividends whether earned or declared or not; for payment per share on that same basis in the event of a voluntary liquidation, dissolution or winding up of the affairs of Maryland; and in the event of certain occurrences, including non-payment of the dividend for six quarters, for the prior preferred holders to have the right to elect a majority of the directors of the corporation.

4. Pursuant to Sinking Fund provisions of Maryland's charter, Allstate's holding of Maryland's prior preferred was reduced by January 15, 1961 from 5,000 shares to 3,000 shares.

5. In 1958 Maryland issued and sold a total of 2,500 shares of its prior preferred to two other insurance companies. Those latter holdings were reduced, by January 15, 1961, by Sinking Fund redemptions, to a total of 1,750 shares.

6. Maryland paid dividends in full on its prior preferred to and including the first quarter of 1961, but thereafter paid no dividends on any class of its stock.

7. By 1960 and 1961, Maryland had become increasingly involved in financial and organizational difficulties, and was incurring operating losses. During 1961 various plans of reorganization and of merger of Maryland were explored but not consummated by its officers and directors. In August 1961, some of Maryland's creditors met with representatives of Maryland to plan for collection of monies due Maryland and payments by Maryland to its creditors in the order of their preference. An agreement dated September 21, 1961, which is referred to herein as the Creditors Agreement, was entered into by Maryland, its creditors and a Creditors Committee, pursuant to which the creditors agreed to a moratorium on all principal amounts due them from Maryland, in order to enable Maryland to effect a plan of liquidation of its existing indebtednesses through the sale of assets.

8. The Creditors Agreement provided, *inter alia,* for the appointment of a collection and disbursement agent for Maryland's creditors for the purpose of receiving and disbursing, in order of the priorities set forth in the Agreement, and particularly in Exhibit "G" thereto, the proceeds to be received from the liquida-

tion. A Special Liquidating Account was established at New York into which such proceeds were to be deposited prior to disbursement by the Committee. Pursuant to Paragraph 8 of the Agreement, the Committee agreed to make distributions from the Special Liquidating Account to its creditors in the order set forth in Exhibit "G" "on account of the principal amount of their respective claims, until the payment in full thereof. * * * "

Under the Agreement, Maryland agreed to make interest payments directly to each creditor. As originally drafted, Exhibit "G" listed, in three separate categories of priority, only "creditors." However, Allstate refused to consent to the Creditors Agreement unless Maryland would agree to continue the liquidation of its assets until there were funds available for the redemption of the outstanding prior preferred and unless the Creditors Committee would agree to continue its collection and disbursement activities until the redemption of such stock and payment in connection therewith was accomplished. Maryland and the Creditors Committee determined that the consent of Allstate was at least desirable and perhaps necessary (a) because of the prior preferred's future right to elect directors in the event of the continued failure of Maryland to pay the dividend on the prior preferred, and (b) in connection with Maryland's projected disposal of assets. Therefore, Exhibit "G" was amended, during the autumn of 1961, with the consent of all concerned, to include the following:

| Category IV<br>Prior Preferred | Amount | Distribution Percentage of Interest |
|---|---|---|
| Allstate Insurance Company | $300,000. | 63.16% |
| Massachusetts Protective Insurance Company | 140,000. | 29.47% |
| Century Insurance Company, Ltd. | 35,000. | 7.37% |
| TOTAL | $475,000. | 100.00% |

No written provision was included in the Agreement or in any Exhibit or any later amendment to the Agreement as to when, whether or how accrued and unpaid dividends were to be paid.

9. During the remainder of 1961 and the early part of 1962, representatives of Maryland, the Creditors Committee and Allstate discussed whether Allstate, when the time would come for payment pursuant to Category IV of Exhibit "G", would be paid par plus (a) unpaid and accumulated dividends and (b) the $3.50 per share redemption premium. Before April 10, 1962, Maryland and Allstate had agreed that Allstate would be paid par plus the said dividends but not the $3.50 premium.

10. By April 10, 1962, all creditors listed in the first three categories of Exhibit "G" had been paid in full, with interest, and funds had been accumulated in the Special Liquidating Account to pay the holders of the prior preferred par value for certain of those shares they held, together with accumulated dividends thereon. On or about April 10, 1962, a payment was made by the Creditors Committee in the sum of $48,449.72 to the holders of the prior preferred. That total payment was calculated on the basis that 450 shares were being redeemed together with unpaid and accumulated dividends thereon. Two hundred and eighty-six shares held by Allstate were so redeemed, Allstate's pro rata share of the total sum being $30,577.14.

11. From early 1961, Maryland's management negotiated reorganizations or mergers of Maryland with several com-

panies, as follows: (a) General Acceptance Corporation, whose offer of merger was rejected early in August, 1961; (b) Atlas Credit Company, with whom negotiations started early in September, 1961, and whose offer of exchange of stock with the holders of the Common, Preferred and Prior Preferred was accepted by those stockholders on November 14, 1961; which negotiation was subsequently terminated in January, 1962; and (c) Oxford, with whom preliminary discussions of merger were had in September, 1962, and which concluded with an approved merger on December 31, 1962.

12. By the spring of 1962, Maryland had greatly contracted its operations. In April of 1962, Maryland entered into an agreement with Oxford, by which the latter company, for a monthly fee, undertook the management and supervision of the collection of the open accounts of Maryland.

13. On April 23, 1962, counsel to Maryland prepared and forwarded a legal memorandum to the Committee and to Allstate. That memorandum began as follows:

*PROBLEM:* Retirement of Prior Preferred Stock of Maryland Credit Finance, together with payment of accrued but undeclared and unpaid dividends thereon.

*FACTS:* Maryland agreed with the Bank Creditors Committee, and indirectly with the creditors for whose protection the agreement was made, to retire all debt. Paragraph 8 of the Agreement directed the distribution of Maryland's funds to the creditors listed on Schedule G, in order of the priority of their respective class, to the principal amount of their claim. The last class, category 4 of Schedule G, listed the Prior Preferred holders at the par value of their shares.

The holders of the Prior Preferred stock of Maryland agreed to the terms of the Bank Creditors Agreement, to which they were not a party. Maryland informally and verbally stated its intention to continue its liquidation of debt until the Prior Preferred was redeemed and paid in full, at par plus accumulated dividends.

Maryland wishes to comply with that agreement, but the Board of Directors of Maryland must perform its terms within the provisions of the corporate law of Delaware, if individual liability of Directors and to some extent presumably individual liability of the Bank Creditors Committee members, is to be avoided.

The memorandum then discussed the legal aspects, under Delaware law and against the background of Maryland's then current capital and earned surplus, of the redemption at par of Maryland's prior preferred out of funds accumulated by the Creditors Committee and the payment of unpaid and accrued dividends thereon, or redemption under Maryland's charter of that stock at the premium price of $103.50; and concluded that no part of any of such actions was then legally permitted.

14. Thereafter, counsel to the Creditors Committee advised the Committee in a letter opinion dated April 26, 1962, that Delaware law permitted the Committee to redeem the prior preferred at par. In this letter, the Committee's counsel stated his disagreement on this one issue with the April 23, 1962, memorandum of Maryland's counsel. Thereafter, and to and including August 1, 1962, and indeed, to and throughout these proceedings, the legal conclusion of the Committee's attorney that the Committee could redeem Maryland's prior preferred at par was accepted and was not questioned or challenged by Maryland, the Committee or Allstate.

15. The April 26, 1962 opinion-letter of counsel to the Committee stated that the Creditors Agreement obligated the Creditors Committee to pay par to the prior preferred, and that said payment was legally permitted under applicable Delaware law. The final paragraph of that letter reads:

In connection with the premium and the accrued interest, this is a matter

between the prior preferred holders and the company which should be worked out between them. We would recommend that no further payments be made until the prior preferred holders and the company work out their differences and all parties agree to future action.

16. Allstate informed Maryland and the Committee that it insisted on payment of the unpaid and accrued dividends, and privately, in the course of internal discussions within its own corporate midst, Allstate also determined to be ready to pursue claims to both dividends and the $3.50 premium. However, Allstate did not notify Maryland or the Committee at any time prior to August 1, 1962, of any change in Allstate's position with regard to the premium which Allstate, prior to April 10, 1962, had agreed to waive.

17. Allstate, Maryland and the Committee discussed the possibility of payment of par plus the dividends if Allstate would agree to indemnify the members of the Creditors Committee, a New York bank closely associated with the operations of the Committee, and the directors of Maryland. On June 28, 1962, Allstate forwarded such a proposed agreement to Maryland and to the Committee. One of the WHEREAS clauses of that draft read:

WHEREAS, Allstate Insurance Company claims that it is entitled to a distribution of the proceeds of the liquidation of assets provided in and by said agreement equal to the par value of said Prior Preferred Shares, plus an amount equal to the accrued and unpaid dividends; and * * *

18. In a letter to the Vice-Chairman of the Creditors Committee dated July 5, 1962, counsel to the Committee, after reviewing the proposed indemnification agreement, recommended that the latter be redrafted to make it clear that the Committee was to distribute only par value, and Maryland was to pay the accrued and unpaid dividends. ("This latter payment is something strictly between Maryland Credit and its stockholders.")

19. Maryland's counsel approved Allstate's draft of the indemnification agreement, suggesting, however, a few minor changes, and one point of substance, namely, that the accrual of dividends on the prior preferred be cut off as of May 23, 1962.

20. On July 24, 1962, Allstate sent a revised draft of the indemnification agreement to Maryland and the Committee. The WHEREAS clause quoted above in Paragraph 17 of this opinion was unchanged. The change recommended by the Committee's counsel and referred to in Paragraph 18 hereof was made. In a covering letter dated July 24, 1962, to Maryland's counsel, Allstate's representative wrote, in part:

In connection with the date on which dividends should cease to accrue, let me suggest that we set a closing date such as August 3 and have dividends payable through the end of July if arrangements can be finalized for the early August closing.

21. At a meeting on July 25, 1962, Maryland's Board of Directors, after hearing the opinion of independent counsel (retained by one of its directors at the latter's individual expense) to the effect that payment of any dividends by Maryland was then presently illegal, adopted a resolution "refusing to declare, pay or authorize the payment of any accumulated dividends on the prior preferred stock, with or without an indemnity agreement," and also instructed its Chairman to write to the Committee, advising the latter "that the redemption of the prior preferred stock should be completed by it on or before August 15th, failing which Maryland Credit's funds held for that purpose should be returned to the Company, and the Bank Creditors Committee dissolved." Counsel for Maryland communicated the position of Maryland's Board, orally by telephone to the Committee on July 26, 1962 and in writing to Allstate and the Committee

by letters dated July 26th and July 27th. The letter dated July 27th concluded:

This is official notification to you and the other members of the * * * Creditors Committee, to whom I am sending a copy of this letter, that the Board has not and will not authorize or consent to the payment of any moneys to the prior preferred holders on account of accumulated and unpaid dividends on prior preferred stock. You, of course, know that the payment of par is completely legal and authorized if it is paid in full redemption of the stock. *Accordingly if any of the insurance companies care to have their stock redeemed, please obtain from them at the date of delivery a release in favor of the company for all liability to them.*

The Board of Directors further directed me to advise the * * * Creditors Committee that in the event the prior preferred stock has not been redeemed by August 15th of this year, that it feels that the activities of the * * * Creditors Committee should be terminated and any funds in its hands should be returned to Maryland * * *.

[Emphasis supplied].

22. On July 27th, the Committee's Chairman wrote to Allstate, stating in part:

[Counsel for] * * * Maryland * * * telephoned me yesterday and stated that their Board voted against being a party to the indemnification agreement regarding the payment of accrued dividends on the Prior Preferred Stock as proposed by Allstate * * *.

On the basis of par value there was $475,000.00 of Prior Preferred Stock outstanding at the time the * * * Creditors Committee was formed. On April 10, 1962, a distribution of $48,-449.70 was made to the holders of the Prior Preferred Stock, therefore, on the basis of par $426,550.30 is still due the Prior Preferred shareholders. The balance in the Maryland * * * Special Liquidating Account here at The Bank of New York totals $438,809.95.

23. The said July 27th letter from the Committee to Allstate also contained a discussion of a new development, namely, that—

This morning the writer received a telephone call from Mr. Donald Cohan, Attorney for HIMC Investment Corporation and Lewis L. Colasurdo. Mr. Cohan stated that he is sending a registered letter to me as Chairman of the * * * Creditors Committee prohibiting any further payments to be made from the Maryland * * * Special Liquidating Account. HIMC Investment Corporation has received a letter from the Internal Revenue Service, which states that $200,000.00 odd in additional taxes is due from Consumers Credit Life Insurance Company. Mr. Cohan stated that in view of the warranties given by Consumers Credit Life Insurance Company they feel it imperative to place an injunction against the Special Liquidating Account. This matter has been referred to our counsel.

The * * * Creditors Committee will keep you fully informed.

Yours very truly,
/s/ H. J. Poduska
Chairman
Bank Creditors Committee
Maryland Credit Finance Corp.

A suit was filed in the United States District Court for the District of Maryland, Civil Action 13975, against Maryland by Hammonton Investment and Mortgage Company, a company which had bought certain of Maryland's assets, alleging that Maryland had represented that it would pay all tax liabilities owed by Maryland and its subsidiaries and that the United States Government had made claim of a substantial deficiency, approximately $800,000, on account of past due taxes against Maryland. In that suit Hammonton sought an injunction against Maryland to restrain it from paying any sums to stockholders. The show cause order required an answer early in August, 1962.

24. On July 30, 1962, the Committee wrote Maryland's counsel acknowledging receipt of the latter's letter of July 27th and concluded:

We cannot approve the last paragraph of your letter in which you feel that the activities of the * * * Creditors Committee should be terminated and any funds in our hands should be returned to the company.

The said last paragraph of the letter of Maryland's counsel dated July 27, 1962, is the last quoted paragraph in Paragraph 21 of this opinion. The Committee, on July 30, 1962, forwarded copies to Allstate of both the July 27th letter received by it from Maryland's counsel and of its own reply letter of July 30, 1962.

25. On July 30, 1962, The Massachusetts Protective Association wrote to the Committee, notifying the latter that Massachusetts' acceptance of par for the prior preferred shares of Maryland held by it should "in no way be construed as a waiver of its claim of entitlement to an additional sum from the proceeds of the liquidation of assets of Maryland Credit Finance Corporation in * * * an amount equal to the accrued and unpaid dividends" on the said shares.

26. On August 1, 1962, the Creditors Committee under advice of its counsel paid an additional sum of $426,550.20 to the holders of the prior preferred stock. Of this sum, $269,422.86 was paid to Allstate, which when added to the $30,577.14 paid to it on April 10, 1962, equalled $300,000.00, the par value of its 3,000 shares of stock. In exchange for payment of par, the prior preferred stockholders delivered their stock to the Creditors Committee for redemption and gave them indemnity for having made said payment from and against the claims of any of Maryland's creditors. That Committee in turn delivered said stock to Maryland for cancellation and retirement. Said stock was duly retired and a Certificate of Redemption was filed by Maryland on December 19, 1962 with the Secretary of the State of Delaware.

27. The indemnity agreement signed by the prior preferred holders was in the form of the revised draft forwarded on July 24, 1962, by Allstate to Maryland and the Committee (see Paragraph 20 of this opinion).

28. After payment was made to Allstate and after the stock had been delivered to Maryland, on August 8, 1962, Allstate wrote a letter to Maryland setting forth a claim to the accrued and unpaid dividends.

29. On August 1, 1962, one of counsel for Maryland wrote as follows to the Committee:

This will acknowledge your telephone call of late on the afternoon of July 31st, in which you advised me, as counsel for Maryland * * *, that the * * * Creditors Committee had determined to pay off the prior preferred. You informed me that this action was being taken on advice of counsel for the Committee, to the effect that the pending suit in the United States District Court for the District of Maryland between Hammonton Investment and Mortgage Company and Maryland * * *, would not have any effect on action of the * * * Creditors Committee under the agreement between it and Maryland * * *. This, of course, is the opinion of your counsel and I do not make any comment on it. I have already mailed to you a copy of the suit papers in the above action, so that your counsel may give it further study if desired.

It is assumed that only par will be paid on the prior preferred, in accordance with * * * [my partner's] prior communications to you. It is further assumed that the * * * Creditors Committee will make payment in exchange for the prior preferred certificates *and will obtain from the holders of the prior preferred appropriate releases with respect to accumulated dividends;* see * * * [*my partner's*] *letter to you under date of July 27, 1962.*

It is my understanding that upon completion of the redemption of the prior preferred, the excess funds in the hands of the * * * Creditors Committee will be turned back to Maryland * * *. [Emphasis supplied].

30. On August 2, 1962, the Committee's Chairman, in a letter to Maryland's counsel, wrote in part:

On August 1, 1962, * * * Creditors Committee made payment in exchange for the Prior Preferred Stock on the basis of par value. Enclosed are 3,000 shares with stock powers surrendered by Allstate & Co.; 1,400 shares with stock powers surrendered by The Massachusetts Protective Association, Inc., and 350 shares with stock powers surrendered by Century Insurance Company, Ltd. This completes the distributions to be made by the * * * Creditors Committee as per the terms of our agreement. After giving effect to the above the balance remaining in the Special Liquidating Account totals $12,259.65. We would appreciate hearing from you as to the disposition of these funds.

\* \* \* \* \* \*

*We have not obtained a release from the Prior Preferred Stockholders with respect to the accumulative dividends.* [Emphasis supplied].

31. On August 8, 1962, Allstate wrote as follows to Maryland:

We wish to inform you that on August 1, 1962, we received from the * * * Creditors Committee of Maryland * * * an amount equal to $269,255.14. Pursuant to the demand of the * * * Creditors Committee we delivered 3,000 shares of Maryland * * * 6% Prior Preferred Stock to the * * * Creditors Committee. As you are aware, as holders of 6% Prior Preferred Stock, we have claimed from you an amount equal to accrued and unpaid dividends due on the 6% Prior Preferred Stock under the terms of the Corporation's Articles of Incorporation and as agreed to by the shareholders and Board of Directors of Maryland

* * *. The delivery of the stock certificates by us was done with no intent to prejudice or waive any rights we have to collect the amount due in connection with the 6% Prior Preferred Stock.

32. On August 29, 1962, Maryland's counsel wrote to Allstate rejecting Allstate's claim to dividends, as stated in Allstate's letter of August 8th.

33. Maryland merged into and with Oxford, effective January 1, 1963.

34. On February 15, 1963, Maryland's counsel received notification from Baltimore counsel for Allstate that the latter was claiming accrued and unpaid dividends on Maryland's prior preferred. Maryland's counsel immediately wrote to the Vice Chairman of the Committee, stating in part:

You may recall that Maryland's instructions to the * * * Creditors Committee were to collect a release of all claims at the time of surrender and payment of the principal sum, but that this was not accomplished because the surrender was made on a moment's notice when the Hammonton Investment Company suit threatened to impound this money until the termination of our Income Tax controversy. It was my understanding of your and my conversation when you reported to me that this surrender had in fact quite suddenly been accomplished, that Allstate and the other prior preferred owners had waived all claims except to the par value of the stock surrendered. I, of course, am aware that no such waiver was in writing, but in view of our absolute refusal to pay any dividends, I believed that you felt, as I certainly did, that it was understood that payment would constitute a waiver.

35. On February 19, 1963, the Committee's Vice Chairman replied to Maryland's counsel as follows:

I refer to your letter of February 15, 1963 concerning the payment of principal of the prior preferred stock of Maryland Credit Finance Corporation on August 1, 1962.

I have reviewed our files and talked with * * * [the Committee's Chairman], who incidentally is away on vacation, to reconstruct what took place during the time these payments were rushed through. * * * [The Committee's Chairman] recalls, and our files confirm, that the holders of the prior preferred stock specifically did not waive their rights concerning accumulated dividends upon the payment of the principal sum and subsequent retirement of the stock. In a letter dated July 30, 1962 from The Massachusetts Protective Association to * * * [the Committee's Chairman] accepting payment of the par value of the 1,400 shares of the prior preferred stock of Maryland * * *, they state that their acceptance of par value " * * * shall in no way be construed as a waiver of this claim of entitlement to an additional sum from the proceeds of the liquidation of assets of Maryland * * in the amount of $15,400.00 being an amount equal to the accrued and unpaid dividends of said 1,400 shares of prior preferred stock." In addition, in a letter dated August 6, 1962 from the Continental Illinois National Bank and Trust Company of Chicago as trustee for Allstate Insurance Company they state "We understand that the Allstate Insurance Company has not waived any interest claims on these preferred shares."

My recollection of our conversation to which you refer in your letter of February 15 is that I referred to the three agreements of indemnity, each dated July 30, 1962, given to the * * Creditors Committee by Allstate, Massachusetts Protective, and Century and each of which hold the Committee and its individual members harmless should a suit arise because of the par value payment made on August 1, 1962. Each of these indemnity agreements specifically reserves the holders claim to unpaid dividends on the shares. In view of this, I am sure that I could not have understood that the payments made would constitute a waiver, and

* * * [the Committee's Chairman] apparently was of the same opinion because our files show that he wrote you on August 2, forwarding the certificates and stating that no releases with respect to the dividends had been obtained.

In examining our files I have also found your letter of July 27, 1962 and * * * [your partner's] letter of August 1, 1962, both to * * * [the Committee's Chairman], informing the * * * Creditors Committee that the Board of Directors of Maryland * * had passed a resolution that no accumulated dividends be paid on the prior preferred stock, and instructing the * * * Creditors Committee not to retire the stock at par value unless releases were obtained from the holders as to the accumulated dividends. However, you will recall that Paragraph 8 on Page 8 of the agreement between Maryland * * * and its Creditors states that "The Bank Creditors Committee shall distribute to the Creditors of Maryland * * * payments on account of the principal amount of their respective claims until payment in full thereof in the order set forth in Exhibit "G" hereto." On Page 9 of this agreement it states that Maryland will pay the interest directly. Therefore, it was believed that the action taken on August 1, 1962 would be correct notwithstanding the above mentioned letters from you and * * * [your partner]. Certainly, both the Committee and the Board agreed that the payment of dividends at the time the stock was retired was not legal. However, because of the terms of the agreement, the Committee was not in a position where it could be obligated to obtain a waiver from the prior preferred stockholders as to accumulated dividends prior to paying par value. Of course, as you point out, the whole transaction took place with considerable speed when the Hammonton Investment Company suit came into the picture, and I do not know what conversations may have taken place be-

tween the various parties at that time, since, as you may recall, I was on vacation then and did not return until August 6. \* \* \* [The Committee's Chairman] has told me that payment was made on the advice of counsel that it was legal, and I believe with the concurrence of all the interested parties \* \* \*.

36. On July 12, 1963, Baltimore counsel for Allstate wrote to Oxford, demanding payment of an amount equal to accrued and unpaid dividends on 3,000 shares of Maryland's prior preferred plus a premium of $3.50 per share, plus interest on both the said dividends and the said premium from the date due.

## I.

These findings of fact inescapably point the Court toward its conclusion. In the fall of 1961, Allstate and the other prior preferred holders consented to the liquidation plan embodied in the Creditors Agreement, and Maryland and the Creditors Committee agreed to redeem the prior preferred at par pursuant to the Creditors Agreement. By April 10, 1962, Maryland and Allstate had further agreed that Allstate would give up any right Allstate had as a prior preferred holder to receive the $3.50 per share premium and Maryland agreed to pay the accrued and unpaid dividends. Accordingly, on April 10, 1962, the Committee redeemed certain of the prior preferred shares at par plus the dividends thereon accrued and unpaid at that time.

The undertakings by Maryland and Allstate, entered into during the period which began in the fall of 1961 and ended no later than April 10, 1962, were each supported by consideration. Maryland and the Creditors Committee desired Allstate's consent to the liquidation of debt and sale of assets program set forth in the Creditors Agreement. Whether or not they needed Allstate's consent, Allstate clearly was not required to give such consent, but it did do so. Allstate, in the fall of 1961, clearly had no then present right to have Maryland agree to redeem the prior preferred. Further, Allstate clearly had no right in the fall of

1961, to require Maryland and the Committee to include the prior preferred as a fourth category under Exhibit "G" of the Creditors Agreement.

In the fall of 1961, the questions of whether accrued dividends and the premium would be paid, if and when prior preferred redemption payments became due and payable under the Creditors Agreement, were apparently not resolved. However, before April 10, 1962, they were resolved and the agreement between Maryland and Allstate in connection with them was solidified. That agreement was reaffirmed and ratified by the concurrence of Allstate and Maryland in the Committee's action on April 10, 1962, on which date the Committee paid par plus dividends then accrued to the holders of the prior preferred. Later, because of advice by the Committee's counsel to the effect that the Creditors Agreement provided for the Committee to pay par only, the April 10, 1962 payment by the Committee to the prior preferred holders was adjusted retroactively without objection from anyone concerned to reflect payment of par only, and the payment of dividends was left by the Committee for direct handling between Maryland and Allstate, both of which, prior to April 10, 1962, had agreed on inclusion of dividends and exclusion of premium.

## II.

Neither Allstate nor Maryland agreed at any time on or after April 10, 1962, to any change in the obligations of the other under the agreement they had reached prior to that date with regard to dividends and premium, though Maryland did try unsuccessfully to get Allstate to agree that the accrual of such dividends would cease on May 23, 1962, and not continue thereafter to accrue.

During the days immediately preceding August 1, 1962, Maryland requested the Committee to obtain a release from the prior preferred holders of all claims to accrued dividends before or simultaneously with the Committee's par redemption payments to the prior preferred holders. But the Committee made payment at par without requiring the prior preferred holders

to execute any such release, and Allstate accepted the redemption payment at par from the Committee with a specific reservation of its claim to the dividends. So did one of the other two prior preferred holders. Allstate was advised, on or shortly before August 1, 1962, by retained outside counsel, that its surrender of its prior preferred shares and its acceptance from the Committee of the par redemption price might raise a legal question concerning Allstate's right to require payment in the future of dividends accrued to August 1st. Allstate, in surrendering the stock, clearly decided to take the bird which was at hand and to worry about its future rights with regard to the bird in the bush at a later date. Thus, this Court is now asked to determine at this date whether that bird in the bush still lives and belongs to Allstate. Maryland's position, in effect, is that Allstate, by its surrender of the prior preferred shares and acceptance of the par redemption price from the Committee, legally abandoned and permanently killed once and for all, the bird in the bush. With this position, this Court does not agree.

█ Cases which deal with redemptions solely pursuant to and in accordance with corporate charter rights and requirements are not apposite. Here, the August 1, 1962 surrender and payment was pursuant to contractual rights and obligations which were created by Maryland and Allstate and superimposed by them upon existing charter rights and requirements. The survival, after August 1, 1962 of Allstate's rights with respect to dividends accrued on that date rests upon those contractual rights and obligations. Whether pursuant thereto Allstate became, at any time from and after the fall of 1961, a creditor in any sense of that word need not be here determined. The meaning of the Maryland-Allstate agreement is clear, i. e., dividends but no premium.

With regard to Allstate's claim for premium payment, Maryland was not informed at any time prior to August 1, 1962, and indeed was apparently not informed until July 12, 1963, that Allstate was claiming the $3.50 per share premium. Allstate waived its right to that premium by its pre-April 10, 1962 understanding with Maryland. Allstate contends that the events of late July, 1962 and early August, 1962 constituted such a complete breach by Maryland of Maryland's undertakings to Allstate that Allstate then became, and is now, entitled to disregard its contractual understandings with Maryland and to reassert Allstate's rights under Maryland's corporate charter as a holder of Maryland's prior preferred. Allstate asserts that Maryland engaged in a voluntary liquidation, dissolution, or winding up of its affairs within the meaning of Maryland's charter; and that therefore the premium payment became due and payable under the charter. In the alternative, Allstate takes the position that Maryland (together with the Committee) redeemed Allstate's prior preferred under the charter. However, the short answers are that regardless of whether Allstate had a right in July or August, 1962, to rescind its pre-April 10, 1962 agreement with Maryland concerning the prior preferred dividends and the $3.50 premium, Allstate did not, at any time, so do, and that the August 1, 1962 payment of the Committee was made by the Committee solely pursuant to the Creditors Agreement.

### III.

█ From and after August 1, 1962, Maryland's continuing obligation to Allstate was to pay dividends on the prior preferred which were accrued and unpaid on August 1, 1962, when and if Maryland legally could make such payment. That obligation remained in being on January 1, 1963. By merger Oxford succeeded to that obligation of Maryland. Oxford does not dispute or question in this proceeding that its capital structure and financial statement on January 1, 1963 and thereafter permitted and permits such payment *if* Maryland, at the time of the merger, was legally obligated to pay such dividends, *and if* Oxford succeeded to that obligation. Oxford con-

tends that even if Maryland was so obligated on January 1, 1963, the merger extinguished the obligation. Whether the contractual rights of Allstate to receive dividends from Maryland, which rights were still in existence at the time of the Oxford-Maryland merger, could have been altered by that merger, is not here relevant, because the fact is that no attempt was made to alter them. Indeed, the merger documents contain no reference to such right of Allstate or to Maryland's corresponding obligation, and Maryland's position at all times after August 1, 1962, has been that no such right or obligation existed at any time after August 1, 1962. Since this Court has determined that Maryland had a continuing obligation from and after August 1, 1962, to pay the dividends, if and when such payment legally could be made, this Court has no difficulty in concluding that that obligation passed by merger to Oxford.

### IV.

Judgment in this case is hereby entered for Allstate against Oxford in the amount of $28,500.00 (an amount equal to the accrued and unpaid dividends for six and one-third calendar quarters on the 3,000 shares of Maryland's 6% per annum, $100 par prior preferred held by Allstate and surrendered by it on April 10, 1962 and August 1, 1962), with interest thereon at the rate of six percent (6%) per annum commencing January 1, 1963. Allstate claims interest on the dividends from and after August 1, 1962 and challenges whether Maryland was indeed legally unable on August 1, 1962, or at any time during the period in question, to pay the accrued and unpaid dividends on the prior preferred. However, Allstate at no time after April 23, 1962 or prior to August 1, 1962, or indeed, as far as this Court is informed, prior to the institution of this suit, raised that question. Indeed, Allstate, like Maryland and the Creditors Committee, accepted the legal conclusion of Maryland's counsel, stated on April 23, 1962; that such dividends could not be paid legally by Maryland during the period

from April 10, 1962, to and including August 1, 1962, and Allstate apparently continued to accept the applicability of that opinion during the period up to the date of the Oxford-Maryland merger. Allstate is therefore entitled to interest on the judgment in this case only from and after January 1, 1963, the first date upon which the dividends could have legally been paid in accordance with the terms of the April 23, 1962, opinion of Maryland's counsel. Maryland urges that such interest should not begin to run until July 12, 1963, the date of Allstate's formal demand letter to Oxford. However, Allstate clearly restated its continuing demand for payment of the dividends when the August payment at par took place, and again on August 8, 1962.

Judgment for plaintiff in the amount of $28,500.00 plus interest to be calculated as aforesaid.